1  LAW OFFICE OF KURT DAVID HERMANSEN
   Kurt David Hermansen, Cal. Bar No. 166349
2  110 West C Street, Suite 1810
   San Diego, California  92101-3909
3  Telephone:    (619) 236-8300
   Facsimile:     (619) 236-8400
4  KDH@KurtDavidHermansen.com
   Attorney for Defendant
5  CUAUHTLAHTOUAC HERNANDEZ

6

7

8

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF CALIFORNIA

11  ─────────────────────────────────

12  UNITED STATES OF AMERICA,          )   Case No.  08cr1436 LAB
                                       )
13            Plaintiff,               )   **FIRST AMENDED** MEMORANDUM OF
                                       )   POINTS  AND  AUTHORITIES  IN
14  v.                                 )   SUPPORT OF DEFENDANT'S MOTIONS
                                       )
15  CUAUHTLAHTOUAC HERNANDEZ,          )
                                       )
16            Defendant.               )
                                       )
17

18  ─────────────────────────────────

19  I.    **STATEMENT OF FACTS**[1]

20        Mr. Hernandez is charged in a one-count Indictment with transporting an illegal alien and

21  aiding and abetting in violation of 8 U.S.C. § 1324(a)(1)(A)(ii) and (V)(II).

22        At approximately 8:50 p.m. on April 6, 2008, Border Patrol Agent ("Agent") Jeffrey

23  Denise was conducting surveillance duties in the area of Alpine, California.  Bates Stamp

24  ("BS") 11.[2]  Agent Denise saw two vehicles traveling eastbound on Interstate 8.  *Id*.  The first

25

26  ───────────

27        [1] This statement of facts and the facts contained in this motion are not concessions or
   admissions.  Instead, they are based primarily on a review of the discovery provided by the
   government.  Mr. Hernandez reserves the right to challenge the accuracy of these alleged facts
28  and in no way admits to their accuracy.
        [2] The Bates Stamp (BS) citations refer to the pages of discovery provided by the government
   to defense counsel.

1    of the two vehicles was a Ford Escort ("Ford Escort"), being driven by Mr. Hernandez. *Id*. at

2    11, 15.  The second vehicle was a Dodge Ram ("Dodge Ram") 2500 pickup truck, being driven

3    by Dominick Smith.  *Id*.  The agents believed the two vehicles were driving in "tandem" with

4    each other, with the Dodge Ram driving behind the Ford Escort. *Id*. at 11.

5         Both the Ford Escort and the Dodge Ram exited Interstate 8 and entered the Viejas

6    Casino parking lot. *Id*. at 12.  According to agents, the vehicles parked next to each other and

7    two men exited from each vehicle. *Id*.  All four men talked for approximately ten minutes. *Id*.

8    Then, the men got back in their vehicles and the two vehicles continued traveling eastbound on

9    Interstate 8. *Id*.

10        At some point during agent surveillance, the Dodge Ram picked up excessive speed and

11   passed Mr. Hernandez's vehicle. *Id*. at 13.  Although agents could not keep up with the Dodge

12   Ram and lost sight of it, agents continued following Mr. Hernandez's vehicle until it exited at

13   Mountain Springs Road. *Id*.  Mr. Hernandez turned around and headed westbound toward the

14   Golden Acorn Casino. *Id*.  Mr. Hernandez exited at the Jacumba Exit and pulled into the Valero

15   Gas Station.  *Id*.  Both Mr. Hernandez and his passenger, Isaac Espinoza, entered the

16   convenience store and got back into the Ford Escort.  *Id*.  Mr. Hernandez then drove to the

17   Golden Acorn Casino. *Id*.

18        While waiting to park his Ford Escort in a parking spot at the casino, agents knocked on

19   Mr. Hernandez's window and identified themselves as border patrol agents. *Id*.; *see also* Exhibit

20   A, (Declaration of Mr. Hernandez).  Agent Denise yelled, "Get out of the car." Ex. A.  Agents

21   immediately handcuffed Mr. Hernandez and Mr. Espinoza, put them up against the vehicle, and

22   told them they were under arrest for conspiracy to smuggle aliens. *Id*.  Both Mr. Hernandez and

23   Mr. Espinoza told agents they were United States citizens.  *Id*.; *see also*  BS 13.  No

24   undocumented persons were found in Mr. Hernandez's vehicle.  BS 13.

25        It is not clear from the agents' reports how long Mr. Hernandez and Mr. Espinoza were

26   detained before agents found the Dodge Ram that escaped their surveillance detection earlier.

27   *Id*.  However, at some point after Mr. Hernandez was arrested, agents serendipitously regained

28   surveillance of the Dodge Ram.  BS 13.  The Dodge Ram tried to flea from border patrol by

driving erratically away from agents' surveillance vehicles. *Id*. Tire deflation devices used to stop the Dodge Ram from escaping were futile because the Dodge Ram kept driving. *Id*. The Dodge Ram entered Interstate 8 going eastbound in the westbound traffic lane for a substantial period of time before coming to a stop. *Id*. When the Dodge Ram finally did come to a stop, border patrol found 16 undocumented persons from Mexico in and around the Dodge Ram. *Id*. The driver and passenger of the Dodge Ram were later identified as Robert ("Rascal") Barraza and Dominique Smith. *Id.* at 14. All 20 subjects, including Mr. Hernandez, were eventually taken to the El Cajon Border Patrol Station for questioning. *Id*.

Before taking Mr. Hernandez to the El Cajon Border Patrol Station, Agent Denise first drove Mr. Hernandez approximately ten miles eastbound on Interstate 8 to some other type of border patrol station. Ex. A. At that station, Mr. Hernandez and Mr. Espinoza were placed in two, side-by-side cells for approximately five to ten minutes. *Id*. Neither were interrogated at that station. *Id*. Then, Mr. Espinoza was taken out of his cell followed by Mr. Hernandez. *Id*. Agents put the men in two different SUV's and drove toward the El Cajon Border Patrol Station; Mr. Hernandez in one SUV; Mr. Espinoza in another. *Id*.

During the ride to the El Cajon Border Patrol Station, Mr. Hernandez asked Agent Denise, "What's going on?" *Id*. Agent Denise told Mr. Hernandez, "We're going to take you to the station, get you some food, ask you a couple questions, and then give you a ride to the trolley." *Id*. In response, Mr. Hernandez stated, "The trolley? I have a car." *Id*. Agent Denise told Mr. Hernandez, "When we release you," you will have to call the station and "they" will decide whether you can have your car back. *Id*.

At the El Cajon Border Patrol Station, Mr. Hernandez was placed in cell number two, the second cell as one walks into the border patrol station. *Id*. While waiting to be interrogated, Mr. Hernandez watched as two of his co-defendants, Rascal Barraza and Dominick Smith, were brought into the station. *Id*. Mr. Hernandez watched as an agent brought Mr. Barraza into the station. *Id*. Mr. Barraza was dirty and his face looked red and swollen. *Id*. The agent walked Mr. Barraza past Mr. Hernandez's cell, placed him on a bench, and handcuffed him to that bench. *Id*. Then, Mr. Hernandez watched as an agent brought Dominick Smith into the station.

1   *Id*. Mr. Smith's shirt was ripped down the middle, near his chest area. *Id*. Mr. Smith was also

2   bleeding from his neck, arms and legs. *Id*. The agent walked Mr. Smith past Mr. Hernandez's

3   cell, placed him on another bench, and handcuffed him to that bench. *Id*. Shortly thereafter,

4   Mr. Hernandez was taken out of cell number two and interrogated. *Id*.

5       Mr. Hernandez did not receive any water either before or during his interrogation. *Id*.

6   Although he received water ***after*** his interrogation, Mr. Hernandez had to ask for it. *Id*. Only

7   then, two hours after his interrogation, did an agent give him and his co-defendants some water

8   and some crackers. *Id*.

9       Although he was promised food by Agent Denise, no one gave Mr. Hernandez food

10  before or during his interrogation. *Id*. Aside from receiving some crackers after his

11  interrogation, Mr. Hernandez did not receive any food of substance ***two hours after*** he was

12  interrogated when a border patrol agent, unrelated to this case, gave Mr. Hernandez food at

13  roughly 4:30 a.m. on April 7, 2008. *Id*. No one took Mr. Hernandez to the trolley station after

14  he was interrogated. *Id*.

15      During his interrogation, Mr. Hernandez did not admit that he was part of an alien

16  smuggling group the night of April 6, 2008. BS 16-17. He denied riding in tandem with the

17  Dodge Ram and denied talking to the occupants of the Dodge Ram at the Viejas Casino. *Id*. at

18  17. Mr. Hernandez allegedly contradicted some of his statements concerning his travel to the

19  Golden Acorn Casino after confronted with information that agents were watching him and the

20  Dodge Ram. *Id*.

21      Mr. Hernandez originally told agents that he went straight from his house to the Golden

22  Acorn Casino. *Id*. at 16. Then, agents told him they saw him at the Viejas Casino and asked if

23  he wanted to change his story. *Id*. Mr. Hernandez stated that he stopped for gas; he got lost; and

24  he had to call his girlfriend for directions to the Golden Acorn Casino and "that was the only

25  part [of his story] that change[d]." *See* Mr. Hernandez's Video-taped Statement.

26  **II.    MOTION TO COMPEL DISCOVERY**

27      Defendant moves for the production of discovery pursuant to FED. R. CRIM. P. 12(b)(4)

28  and 16. This request is not limited to items the prosecutor knows of, but rather includes all

1   discovery listed below that is in the custody, control, care, or knowledge of any investigative or

2   other governmental agencies closely connected to the prosecution.  *See Kyles v. Whitley*, 514

3   U.S. 419, 437 (1995); *United States v. Bryan*, 868 F.2d 1032, 1035 (9th Cir. 1989).

4           1.      Defendant's Statements.  The Government must reveal all written/oral

5   statements made by Defendant, regardless of whether the Government intends to make any use

6   of those statements.  *See* FED. R. CRIM. P. 16(a)(1)(A); *id.* advisory committee's note (1991

7   amendments); *see also United States v. Bailleaux*, 685 F.2d 1105, 1113-14 (9th Cir. 1982).

8           2.      Personnel Records of Government Officers Involved in the Interrogation.

9   Defendant moves for production of all citizen complaints and other related internal affairs

10  documents involving any of the immigration officers or other law enforcement officers who

11  were involved in the investigation, arrest and interrogation of Defendant.  *See Pitchess v.

12  Superior Court*, 11 Cal. 3d 531, 539 (1974).  Because of the sensitive nature of these documents,

13  defense counsel will be unable to procure them from any other source.

14          3.      Government Examination of Law Enforcement Personnel Files —

15  Especially the Personnel Files and All Files Pertaining to the Interrogating Officers.  Defendant

16  requests that the Government examine the personnel files and any other files within its custody,

17  care or control, or which could be obtained by the government, for all testifying witnesses,

18  including testifying officers.  Defendant requests the attorney for the Government review these

19  files for evidence of perjury or other similar dishonesty, or any other material relevant to

20  impeachment, or any information that is exculpatory, pursuant to its duty under *United States

21  v. Henthorn*, 931 F.2d 29, 30-31 (9th Cir. 1991).  The obligation to examine files arises by virtue

22  of the defense making a demand for their review.  The Ninth Circuit in *Henthorn* remanded for

23  *in camera* review of the agents' files because the government failed to examine the files of

24  agents who testified at trial.  This Court should therefore order the Government to review all

25  such files for all testifying witnesses and turn over any material relevant to impeachment or that

26  is exculpatory to Defendant before trial.  Defendant specifically requests that the prosecutor, not

27  the law enforcement officers, review the files in this case.  The duty to review the files, under

28  *Henthorn*, should be the prosecutor's.  Only the prosecutor has the legal knowledge and ethical

1    obligations to fully comply with this request. *See United States v. Jennings*, 960 F.2d 1488,

2    1492 (9th Cir. 1992); *see also Kyles v. Whitley*, 514 U.S. 438, 437 (1995) (prosecutors have "a

3    duty to learn of any favorable evidence known to the others acting on the government's behalf

4    in the case, including the police").

5            4.    <u>Arrest Reports, Notes and Dispatch Tapes & Radio Traffic</u>. Defendant also

6    specifically moves for a copy of all arrest reports, notes, dispatch or any other tapes, and TECS

7    records that relate to the circumstances surrounding Defendant's arrest or any questioning.  This

8    request includes any ***rough notes***, records, reports, transcripts or other documents in which

9    Defendant's statements or any other discoverable material is contained.

10            5.    <u>Brady Material</u>. Defendant moves for a copy of all documents, statements,

11   agents' reports, and tangible evidence favorable to Defendant on the issue of guilt or which

12   affects the credibility of the Government's witnesses and case.  Under *Brady*, impeachment and

13   exculpatory evidence constitutes evidence favorable to the accused. *See United States v. Bagley*,

14   473 U.S. 667, 676-78 (1985); *United States v. Agurs*, 427 U.S. 97, 102-06 (1976).

15            6.    <u>Defendant's Prior Record</u>.  Under FED. R. CRIM. P. 16(a)(1)(B), Defendant

16   specifically moves for a copy of Defendant's prior criminal record within the possession,

17   custody, or control of the government.  Defendant specifically requests that the copy be com-

18   plete and legible; faint, obscured or otherwise illegible copies of rap sheets are not acceptable.

19            7.    <u>Any Proposed 404(b) Evidence</u>.  The government must produce evidence

20   of "other acts" under FED. R. CRIM. P. 16(a)(1)(C) and FED. R. EVID. 404(b), 609. *See United*

21   *States v. Vega*, 188 F.3d 1150, 1154 (9th Cir. 1999) (holding that Rule 404(b) "applies to all

22   'other acts,' not just bad acts").  This request includes any TECS records the Government

23   intends to introduce at trial, whether in its case-in-chief, for possible impeachment, or in

24   rebuttal.  *Id.*  In addition, under Rule 404(b), Defendant specifically requests the government

25   "provide reasonable notice in advance of trial . . . of the general nature" of any evidence the

26   government proposes to introduce under FED. R. EVID. 404(b) at trial.   *See id.* at 1154-55.

27   Additionally, Defendant requests that such notice be given ***three weeks*** before trial to give the

28   defense time to adequately investigate and prepare for trial.

1         8.   <u>TECS Reports</u>.  Defendant moves for all TECS reports.  Rule 404(b)

2  "applies to all 'other acts,' not just bad acts." *Vega*, 188 F.3d at 1154; *see* FED. R .EVID. 404(b).

3         9.   <u>Evidence Seized</u>. Under Fed. R. Crim. P. 16(a)(1)(C), the defense moves

4  for a copy of discovery of evidence seized as a result of any search.

5        10.   <u>Request for Preservation of Evidence</u>.  Defendant specifically moves for

6  the preservation of all dispatch tapes and any other physical evidence that may be destroyed,

7  lost, or otherwise put out of the possession, custody, or care of the Government and which

8  relates to the arrest or the events leading to the arrest in this case. *See Riley*, 189 F.3d at 806-08.

9  Defendant further requests that the government be ordered to question all the agencies and

10 individuals involved in the prosecution and investigation of this case to determine if such

11 evidence exists, and if it does exist to instruct those parties to preserve it.  This request also

12 includes any material or percipient witness who might be deported or is otherwise likely to

13 become unavailable (e.g., undocumented aliens and transients). U.S. Customs Service requires

14 a court order for the preservation of narcotics, and Defendant hereby moves for such an order.

15       11.   <u>Tangible Objects</u>. Under Fed. R. Crim. P. 16(a)(2)(C), Defendant specific-

16 ally requests the opportunity to inspect and copy and test, if necessary, all documents and

17 tangible objects, including any books, papers, photographs, buildings, automobiles, or places,

18 or copies, depictions, or portions thereof which are material to the defense or intended for use

19 in the government's case-in-chief, or were obtained from or belong to Defendant.

20       12.   <u>Evidence of Criminal Investigation of Any Government Witness</u>.

21 Defendant moves for production of any evidence that any prospective witness is under

22 investigation by federal, state or local authorities for any criminal conduct.

23       13.   <u>Jencks Act Material</u>.  Defendant moves for production in advance of trial

24 of all material, including dispatch tapes, which the Government must produce pursuant to the

25 Jencks Act, 18 U.S.C. § 3500 and FED. R. CRIM. P. 26.2.  Advance production will avoid the

26 possibility of delay at the request of defendant to investigate the Jencks material.  A verbal

27 acknowledgment that "rough" notes constitute an accurate account of the witness' interview is

28

1  sufficient for the report or notes to qualify as a statement under § 3500(e)(1). *Campbell v.*

2  *United States*, 373 U.S. 487, 490-92 (1963).

3         14. <u>Expert Summaries</u>. Defendant moves for production of written summaries

4  of all expert testimony the Government intends to present under Federal Rules of Evidence 702,

5  703 or 705 during its case-in-chief, written summaries of the bases for each expert's opinion,

6  and written summaries of the experts' qualifications. FED. R. CRIM. P. 16(a)(1)(E)-(G).

7         15. <u>Reports of Scientific Tests or Examinations</u>. Under Fed. R. Crim. P.

8  16(a)(1)(D), Defendant moves for discovery of the reports of all tests and examinations

9  conducted upon the evidence in this case, including but not limited to any fingerprint analyses

10  or chemical tests that are within the possession, custody, or control of the government, the

11  existence of which is known, or by the exercise of due diligence may become known, to the

12  attorney for the government, and which are material to the preparation of the defense or which

13  are intended for use by the government as evidence-in-chief at trial.

14         16. <u>Residual Request</u>. Defendant intends by this discovery motion to invoke

15  the right to discovery to the fullest extent possible under the Federal Rules of Criminal

16  Procedure and the Constitution and laws of the United States. This request specifically includes

17  all subsections of Rule 16. Defendant requests that the Government provide Defendant and his

18  attorney with the above requested material sufficiently in advance of trial to avoid unnecessary

19  delay before trial and before cross-examination.

20  **III.  MOTION TO SUPPRESS STATEMENTS**

21      **A.  Mr. Hernandez Was Seized For Purposes of Fourth Amendment Protection.**

22      "When a police officer makes a traffic stop, the driver of the [vehicle] is seized within

23  the meaning of the Fourth Amendment." *Brendlin v. California*, ___U.S.___, 127 S.Ct. 2400,

24  2403 (2007). A person is seized by the police when the officer, "'by means of physical force

25  or show of authority,' "terminates or restrains his freedom of movement." *Id*. at 2405 (*citing*

26  *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A seizure occurs if "in view of all the

27  circumstances surrounding the incident, a reasonable person would have believed that he was

28  not free to leave." *Brendlin*, 127 S.Ct. at 2405 (*citing United States v. Mendenhall*, 446 U.S.

1    544, 554 (1980). Subjective intent of an officer is irrelevant in ordinary Fourth Amendment

2    analysis. *Id*. at 2408-2409.

3        At the time the agents approached Mr. Hernandez's driver's side window, identified

4    themselves as border patrol agents, and ordered him out of his vehicle, Mr. Hernandez was

5    clearly detained for purposes of Fourth Amendment protection. Moreover, Mr. Hernandez was

6    under arrest when Agent Denise handcuffed him, put him up against his vehicle, and told him

7    he was under arrest for alien smuggling. Under these set of facts, a reasonable person would

8    not feel free to leave. Therefore, the Court must determine whether Mr. Hernandez was lawfully

9    detained, and arrested at the Golden Acorn Casino.

10   **B.    There Was No Reasonable Articulable Suspicion to Stop Mr. Hernandez at**

11   **the Golden Acorn Casino and His Statements and the Fruits of Any Search**

12   **Should Therefore, Be Suppressed.**

13       "The Fourth Amendment's prohibition against unreasonable searches and seizures

14   extends to the investigatory stop of a vehicle." *United States v. Sigmond-Ballesteros*, 285 F.3d

15   1117, 1121 (9th Cir. 2002); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975)

16   (The Fourth Amendment "applies to all seizures of the person including seizures that involve

17   only a brief detention short of arrest").

18       In determining whether an investigatory stop is made based on reasonable suspicion, the

19   court "must look at the 'totality of the circumstances' of [the] case to see whether the detaining

20   officer ha[d] a 'particularized and objective basis' for suspecting legal wrongdoing." *Sigmond-*

21   *Ballesteros*, 285 F.3d at 1121; *United States v. Arvizu*, 534 U.S. 266 (2002); *United States v.*

22   *Cortez*, 449 U.S. 411, 417-18 (1981); *see also United States v. Rodriguez*, 976 F.2d 592, 594

23   (9th Cir. 1992), *amended by* 997 F.2d 1306 (9th Cir. 1993) (An officer may not detain a motorist

24   without a showing of a "particularized and objective basis for suspecting the particular person

25   stopped of criminal activity") (internal quotation marks omitted). While the test looks to the

26   "totality of the circumstances," the inquiry nevertheless necessitates a dual approach. First, the

27   court must determine whether there exists specific and articulable facts which, coupled with

28   reasonable inferences, would lead a reasonable, objective officer to believe criminal activity is

1    afoot. *Sigmond-Ballesteros*, 285 F.3d at 1121. Second, the court must determine whether those

2    facts and inferences create a sufficient "basis for suspecting the *particular person* stopped of

3    criminal activity." *United States v. Rodriguez*, 976 F.2d 592, 595 (9th Cir. 1992) (emphasis

4    added).

5         The "reasonable suspicion" requirement means that an officer must reasonably suspect

6    that *the person he or she wishes to detain* is involved in suspicious activity." *United States v.*

7    *Lopez-Soto*, 205 F.3d 1101, 1103 (9th Cir. 2000) (emphasis added). To satisfy this burden, the

8    officer must be able to point to "specific and articulable facts which, together with objective and

9    reasonable inferences, form the basis for suspecting that *the particular person detained* is

10   engaged in criminal activity." *Id.* at 1105.

11        1.    Location and proximity to the border.

12        Agent Denise's report states that the route traveled by the Ford Escort and the Dodge

13   Ram is near the border and commonly used by alien smugglers. However, a "location or route

14   frequented by illegal immigrants, but also by many legal residents, ***is not*** significantly probative

15   to an assessment of reasonable suspicion." *United States v. Manzo-Jurado*, 457 F.3d 928, 936

16   (9th Cir. 2006) (*citing Sigmond-Ballesteros*, 285 F.3d at 1124) (emphasis added).

17        Interstate 8 is used by thousands of law-abiding persons. Legal residents use it as a route

18   to legally gamble at the Viejas Casino and the Golden Acorn Casino. Lawful travelers use

19   Interstate 8 as a route to get to Julian and El Centro. Truck drivers use Interstate 8 to bring

20   cargo to and from El Centro. Attorneys use Interstate 8 to make court appearances in El Centro.

21   The fact that the route is commonly used by alien smugglers should therefore, have little, if any,

22   value in the reasonable suspicion analysis. Interstate 8 is a major interstate highway not a dirt

23   road near the border. Moreover, the topography is mountainous near the casinos, so vehicles

24   cannot cross interrelated border in that area.

25        2.    Evasive maneuvers used to evade, hide or locate border patrol vehicles.

26        There is no evidence that the Ford Escort and Dodge Ram were attempting to ***evade*** a

27   border patrol checkpoint. *See generally United States v. Montero-Camargo*, 208 F.3d 1122

28   (finding reasonable suspicion where two cars with Mexicali license plates were driving in

tandem; the cars made U-turns on the highway instead of using an exit; after the U-turn, both cars stopped together near the checkpoint in a place where agents at the checkpoint could no longer view the cars; and an anonymous tip told agents that the cars in question were driving in tandem and made a U-turn near the checkpoint). *Montero-Camargo* is distinguishable from this case. Here, the Ford Escort did execute a U-turn but did so ***lawfully*** at an exit off the Interstate. The Ford Escort did not attempt to evade a border patrol checkpoint. In fact, there is no evidence the Ford Escort, unlike the Dodge Ram, attempted to evade police detection at all. Thus, there is no particularized suspicion regarding the Ford Escort.

Agent Denise's report emphasizes the fact that the Ford Escort sped up, then slowed down, in an alleged attempt to locate border patrol vehicles. Agent Denise attempts to justify his suspicion of the Ford Escort by stating that the speeding-up and slowing-down was evasive driving. This factor would be relevant if the Ford Escort were driving through flat terrain. *See Montero-Camargo*, 208 F.3d at 1136 (evasive behavior may be an appropriate factor in reasonable suspicion analysis and evasive behavior is defined as "'obvious attempts to evade officers' or hide." ) (*citing Brignoni-Ponce*, 422 U.S. at 885). In *Montero-Camargo*, 208 F.3d at 1136-37, the court discussed three cases where evasive behavior was found to be relevant in a reasonable suspicion analysis including the following: (1) a suspect that took an erratic path through an airport in an attempt to avoid police; (2) after seeing police, three people spoke "furtively" amongst each other and one gentleman was overheard saying, "get out of here," and one of the three men actually attempted to flee; and (3) a case involving "obvious attempts to evade officers or hide."

Here, the Ford Escort did not attempt evasive maneuvers to escape police detection. Although the Ford Escort seemed to speed up and then slow down, the terrain it drove on is comprised mostly of mountains. It is without question that many cars move slower going up a mountain than going down one. Therefore, the Ford Escort was not evasively attempting to evade law enforcement. It is more likely Mr. Hernandez was driving slower going up a mountain and faster going down it, something even law abiding drivers driving through that mountainous area engage in.

1        3.     <u>The turnaround in this case should not be considered in the Court's</u>

2   <u>reasonable suspicion analysis.</u>

3       "A turnaround alone is not enough in and of itself to create reasonable suspicion."

4   *Montero-Camargo*, 208 F.3d at 1137 (citations omitted).  A turnaround along with other

5   relevant factors may be considered in reasonable suspicion analysis.  *Id*. at 1138 (*citing United*

6   *States v. Garcia-Barron*, 116 F.3d 1305, 1307 (9th Cir. 1997).  In *Montero-Camargo*, 208 F.3d

7   at 1138, the court found that a U-turn was significant where the two cars made U-turns together,

8   immediately stopped at the side of a road where illegal activity occurred and the U-turn occurred

9   just after a sign indicating that the border patrol checkpoint had been re-opened.  The court in

10   *Montero-Camargo*, 208 F.3d at 1138, discussed that a U-turn on a highway is very different

11   from reversing direction by using a designated highway because a turnaround using an exit is

12   "both frequent and legal."  *Id*.

13       Here, the Ford Escort did execute a turnaround but did so ***lawfully*** and nowhere near an

14   upcoming border patrol checkpoint.  The Ford Escort used an exit, turned around and then went

15   to a gas station before going to the Golden Acorn Casino.  The turnaround was legal and not in

16   close proximity with an upcoming checkpoint.  Furthermore, the Dodge Ram did not commit

17   the U-turn at the same time as the Ford Escort.  The Dodge Ram was long gone by the time the

18   Ford Escort exited Interstate 8.  Therefore, the turnaround bears no weight in the reasonable

19   suspicion analysis.

20        4.     <u>Tandem driving should not be considered a significant factor in the Court's</u>

21   <u>reasonable suspicion analysis.</u>

22       The court in *Montero-Camargo*, 208 F.3d at 1139, found that tandem driving in that case

23   was a significant factor in the court's reasonable suspicion analysis.  However, in that case, the

24   court considered other circumstances surrounding the tandem driving in making that conclusion.

25   *Id*.  The cars in that case not only turned around together but did so in the middle of the

26   highway; the cars immediately pulled off to the side of the road together where criminal activity

27   took place, and both cars had Mexicali license plates.  *Id*.  Here, the circumstances that

28   accompany the tandem driving in this case are the fact that the two vehicles exited at the Viejas

Casino, parked near each other and talked to one other.  According to Agent Denise's report, in

his experience, the Viejas Casino is a place where alien smugglers talk about their future illegal

plans.  However, this rational should fail for two reasons.  First, an agent's experience cannot

*alone* support a finding of reasonable suspicion and *must* be supported by particular facts that

lead the agent to reasonably believe the particular suspect in question is about to engage in

criminal behavior.  *See Montero-Camargo*, 208 F.3d at 1131 (holding that experience of an

officer does not alone serve as an independent factor for reasonable suspicion analysis and, any

inferences the officer draws from his experience *must* be reasonable.  Second, the Viejas Casino

is used by many law-abiding persons who, either live on the Reservation or go to that casino to

gamble, a legal activity.  *See Manzo-Jurado*, 457 F.3d at 936 (When a location is frequented by

illegal immigrants, but also legal immigrants, the proximity to the border "is not significantly

probative to [the] assessment of reasonable suspicion.").  Therefore, the alleged tandem driving

should not be considered as relevant in determining whether there was reasonable suspicion in

this case.

          5.      <u>Several factors weigh in favor of a finding of a lack of reasonable</u>
<u>suspicion.</u>

Even if the Court considers the factors outlined in Agent Denise's report, it must also

consider factors that weigh against a finding of reasonable suspicion.  *See Manzo-Jurado*, 457

F.3d at 938 (the "totality of circumstances test takes into account both factors weighing for and

against reasonable suspicion.") (citations omitted).

Agents did not have reasonable suspicion to stop and arrest Mr. Hernandez at the Golden

Acorn Casino.  Simply because Mr. Hernandez was being followed by a possible load pickup

truck (the Dodge Ram) and stopped to talk with the occupants inside that truck at the Viejas

Casino, is not enough to form an objective basis to believe *Mr. Hernandez* was engaged in

criminal activity.  Agents may very well have had reasonable suspicion to stop the Dodge Ram

that sped off so fast that surveillance agents could not keep up with it.  At the time

Mr. Hernandez was detained and precipitously arrested, he was no longer being followed by the

suspicious Dodge Ram, and he even stopped at a gas station convenience store before arriving

1   at the Golden Acorn Casino, Mr. Hernandez's destination.  The agents did not have reasonable

2   suspicion to believe that Mr. Hernandez was engaged in criminal activity, namely that he was

3   transporting illegal aliens in the United States.  *See Brignoni-Ponce*, 422 U.S. at 881 ("When

4   an officer's observations' lead him reasonably to suspect a particular vehicle may contain

5   [illegal] aliens . . . , he may stop the [vehicle] briefly and investigate the circumstances that

6   provoke [his] suspicion[s]").  In this case, there was no reasonable suspicion to support an

7   objective belief that Mr. Hernandez's vehicle contained illegal aliens.  Even though there may

8   have been reasonable suspicion to stop the Dodge Ram, there was not reasonable suspicion to

9   stop Mr. Hernandez's vehicle.

10                      6.    Conclusion.

11          For the foregoing reasons, Mr. Hernandez was unlawfully detained and precipitously

12   arrested.

13          Thus, Mr. Hernandez's statements and other fruits of the stop and arrest were made as

14   a result of an unlawful detention and should be suppressed.  *See generally United States v. Wong*

15   *Sun*, 371 U.S. 471, 487 (1963).  Simply because *Miranda* warnings were given sometime after

16   the unlawful detention and before interrogation does not ***alone*** purge the taint of the illegal

17   detention.  *Brown v. Illinois*, 422 U.S. 590, 601 (1975).  All tangible and intangible fruits seized

18   as a result of Mr. Hernandez's unlawful detention should also be suppressed.

19          **C.    Assuming There Was Reasonable Suspicion to Stop Mr. Hernandez, the Stop**

20                  **Exceeded What Was Necessary to Confirm or Dispel the Agents' Suspicions.**

21          Brief *Terry* detentions are permissible when law enforcement wishes to follow up on

22   suspected criminal activity.  An officer must use "the least intrusive means reasonably available

23   to verify or dispel the officer's suspicion in a short period of time."  *Florida v. Royer*, 460 U.S.

24   491, 500 (1983).  The *Terry* detention must be limited in scope to confirm or dispel the

25   justification for the stop.  *Terry*, 392 U.S. at 29.  A seizure that goes beyond *Terry*'s limited

26   scope must be supported by probable cause in order to withstand a challenge to the

27   Constitutionality of the stop.  *Royer*, 460 U.S. at 496.

28

1    Here, law enforcement dispelled any suspicions it had with regard to Mr. Hernandez

2  shortly after detaining him and his passenger, Mr. Espinoza.  After agents determined that

3  Mr. Hernandez and Mr. Espinoza were U.S. citizens and did not discover any illegal aliens

4  inside Mr. Hernandez's vehicle, the detention should have ceased.  Furthermore, agents did not

5  attempt to confirm or dispel their suspicions that Mr. Hernandez was smuggling aliens.  The

6  agents arrested Mr. Hernandez and Mr. Espinoza before they attempted to confirm their

7  suspicions.  Probable cause did not exist to extend the *Terry* detention because agents never

8  asked Mr. Hernandez questions regarding the Dodge Ram or why he was talking to the

9  occupants in the Dodge Ram at the Viejas Casino.  They also didn't ask Mr. Hernandez why he

10  was at the Golden Acorn Casino.  The seizure extended beyond constitutional bounds and was

11  therefore, unlawful.  Mr. Hernandez's statements should be suppressed, as well as other fruits

12  obtained as a result of the unlawfully extended detention.

13  **D.    Mr. Hernandez's Statements Were Obtained As a Result of an Unlawful**

14  **Arrest and Should Be Suppressed.**

15    A *Terry* detention becomes a de facto arrest when it becomes so intrusive that it can no

16  longer be characterized as "a minimal intrusion designed quickly to confirm or dispel the

17  suspicions which justified the initial stop."  *United States v. Sharpe*, 470 U.S. 675, 683-686

18  (1985).  Mr. Hernandez's detention turned into a de facto arrest the instant he was ordered out

19  of his vehicle, handcuffed, and told him he was under arrest for alien smuggling.  Assuming

20  there was reasonable suspicion to investigate whether Mr. Hernandez was engaged in an

21  unlawful activity, at the time agents approached Mr. Hernandez's vehicle, there was no probable

22  cause to arrest him.

23    To arrest an individual, there must be articulable facts to believe that an offense has been

24  or is being committed **by the person** being arrested.  *Dunaway v. New York*, 442 U.S. 200, 208,

25  fn. 9 (1979).  ***Mere propinquity*** to criminal conduct does not give rise to probable cause to arrest

26  or to search an individual.  *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).  Probable cause must be

27  particularized to the person suspected.  *Id*.  This requirement cannot be undercut or avoided

28

1  simply by pointing to the fact that by coincidence, there exists probable cause to arrest another

2  person. *Id*.

3      Even assuming that Mr. Hernandez did talk to the occupants in the Dodge Ram at the

4  Viejas Casino, the fact that he was merely present with the people who later committed the

5  instant offense in a different location did not provide agent's with probable cause to arrest him.

6  At the time the undocumented persons were actually found in and around the Dodge Ram,

7  Mr. Hernandez was long gone.  After the Dodge Ram sped past him, Mr. Hernandez turned

8  around, stopped at a convenience store, and then, proceeded to the Golden Acorn Casino.  He

9  was not near the Dodge Ram at the time the undocumented persons were loaded into the Dodge

10  Ram.  Likewise, he was not near the Dodge Ram when the undocumented persons were found

11  by law enforcement. There was no contraband found inside Mr. Hernandez's vehicle.  There

12  were no illegal aliens found inside Mr. Hernandez's vehicle.  Probable cause to arrest

13  Mr. Hernandez was lacking and his arrest was therefore, unlawful.  Thus, any statements

14  Mr. Hernandez made during his interrogation should be suppressed because they were a direct

15  result of his unlawful detainment, which led to his unlawful arrest.  Likewise, any fruits obtained

16  as a result of Mr. Hernandez's unlawful arrest should also be suppressed.

17      **E.    Mr. Hernandez's Statements Were Coerced and Should Be Suppressed.**

18      A confession is deemed involuntary not only if coerced by physical intimidation, but also

19  if achieved through psychological pressure. "The test is whether the confession was 'extracted

20  by any sort of threats or violence, [or] obtained by any direct or implied promises, however

21  slight, [or] by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30 (1976)

22  (*quoting Bram v. United States*, 168 U.S. 532, 542-43 (1897)).  *Accord United States v. Tingle*,

23  658 F.2d 1332, 1335 (9th Cir. 1981).  *See also* 18 U.S.C. § 3501(a) (A confession is only

24  admissible if it is voluntarily made).  "To be voluntary, an inculpatory statement must be the

25  product of a rational intellect and a free will." *United States v. Crespo de Llano*, 830 F.2d 1532,

26  1542 (9th Cir. 1987).  The government has the burden of proving that the statements were

27  voluntary.  *Id*.

28

1    Here, while transporting Mr. Hernandez to the El Cajon Border Patrol Station, Agent

2    Denise told Mr. Hernandez he was going to "take him to the station, give him some food, ask

3    him a couple of questions, and take him to the trolley station" so he could go home.  When

4    Mr. Hernandez asked why he would be brought to the trolley since he had a car, Agent Denise

5    told him, "When we release you," you can call the station and "they" will decide whether you

6    can have your car back.  Clearly, Agent Denise promised Mr. Hernandez he would be released

7    after answering some questions.  Undoubtedly, Mr. Hernandez agreed to speak to border patrol

8    agents without an attorney present because he objectively believed that he would be released

9    after answering their questions.

10    Furthermore, the agents involved in this investigation engaged in significant physical and

11    psychological intimidation with regard to Mr. Hernandez.   First, Agent Denise drove

12    Mr. Hernandez ten miles eastbound on Interstate 8, in the opposite direction of the El Cajon

13    Border Patrol Station.  Second, Agent Denise put Mr. Hernandez in a cell inside a curious border

14    patrol station without asking him any questions.   Third, agents walked Mr. Barraza and

15    Mr. Smith right past Mr. Hernandez's cell at the El Cajon Border Patrol Station.  These men

16    were arrested in a different location than Mr. Hernandez and came into the station dirty and

17    looked beaten up.  Agents could have placed the co-defendants in cell number one, reducing the

18    likelihood that Mr. Hernandez would see them all disheveled.  Instead, agents attempted to use

19    intimidation to scare Mr. Hernandez into talking to them.  Furthermore, agents did not ease

20    Mr. Hernandez's fears by telling him that his friends tried to escape and that was the reason they

21    were bleeding and their clothes were ripped.   When the agents walked the men by

22    Mr. Hernandez before he was interrogated, he objectively believed the men had been beaten up

23    by law enforcement.  Given that same scenario, a reasonable person would believe that they

24    would also be beaten up if they did not talk to law enforcement.

25    For these reasons, Mr. Hernandez's statements were coerced and should be suppressed.

26

27

28

## IV.    LEAVE TO FILE FURTHER MOTIONS

Defendant hereby requests leave to file further motions as may be necessary.

## V.    CONCLUSION

For the reasons stated above, Defendant respectfully requests that this Court grant the foregoing motions.

Dated: _May 27, 2008_                          _s/Kurt David Hermansen_

Attorney for Defendant
Email:  KDH@KurtDavidHermansen.com